Good morning. First case is number 24-2510. Novo Nordisk Inc against Secretary, United States Department of Health and Human Services. Good morning, Your Honors. May I please the Court, I'm Ashley Parrish on behalf of Novo Nordisk. With your permission, I'd like to say five minutes for rebuttal.  Thank you, Your Honors. Since at least 1946, our Constitution has allowed agencies to be delegated broad authority, but they can only be done that with certain restrictions, and they're simple ones. First, they have to comply with the statutes that are written by Congress. Second, if they try to go beyond implementing the statute with the terms that Congress has set to create their own new law rules and requirements, they have to follow certain procedures followed by judicial review. And when they're regulating prices, Congress has to set some procedures to ensure that they act within constitutional bounds and standards to ensure what they do is reasonable. Your Honor, these essential requirements are important to both public accountability and to protecting private rights that are baked into the Constitution. Every one of these requirements have been violated in this instance, and what I'd like to do is walk through the three main claims that we have. First, that the agency has violated the 10-drug limit in the mandate by engaging in rulemaking. And third, that the statute itself, as implemented by the agency, is unconstitutional because it's been interpreted to have no procedures, no standards, and no judicial review. So starting with the question about the 10-drug mandate, what I want to do is I think there's not much dispute between the parties really. So the statute starts off in Subsection A and says that it shall be no more than 10 negotiation-eligible drugs. Congress started slowly and had a phased-in approach with it increasing over time. If you look later in the statute at Subsection D, negotiation-eligible drug is then referred back to Subsection E, which is defined as either a drug product or a biological product. And if you take a look at the You say it's six products, and they say it's one product. That's correct. And you're on... You need it to be six. Isn't it enough for you to prevail if it's two? Yes, Your Honor. If it's just the Novo group and the FIASP, is that how you pronounce that? It's, my understanding, it's FIASP.  Yes. So even if you're wrong, it's not six, it's just two. That still puts the government over the 10. Correct, Your Honor. Yeah, I think both ways are looking at it. The way we look at it is because it talks about products and not families of products. And because the products are clearly different, because we're talking about different device presentations, different inactive ingredients, different conditions of use for all those products. But clearly, it can't be a different product if it's just different packaging or different delivery. Is it your argument that delivery mechanism's enough for it to be a different product? So, Your Honor, if I may, I think what you're picking up on is the government only has really two arguments. The first of them is that their aggregation by active ingredient and moiety is permitted under the statute because the statute allows aggregation by dosage, form, or strength. And then the second argument is the judicial review bar, which I'll address separately. So, Your Honor, your question goes directly to this question of what can they aggregate. The first point to emphasize is that the words active ingredient and active moiety appear nowhere in the statute. And it is clear that products with the same active ingredient is a much broader category that have more characteristics than just dosage, form, and strength. But we can't talk about just dosage, form, and strength because it's also formulation. The statute says twice, right? And when they're deciding the price and when they're negotiating or calculating the amount spent. So, you've removed that from much of your discussion in your briefing. With respect, Your Honor, the reason we didn't emphasize that is because what it says is this is dosage, form, or strength, comma, including formulations with extended use. And within the FDA world, Your Honor, those are often the same. But it doesn't matter because I'm happy to take on the formulation point because the different characteristics of drug products include, and I'm just going to list here, there's the device presentation, the route of administration, the conditions of use, the inactive ingredients, and the manufacturing processes. And none of those things would be considered different formulations. So, for example, in the case of Novolog, when it was approved back in 2000, it was a syringe from a vial and you'd inject it. The technological innovations that have happened in this area relate to the device presentations. It's not just the active ingredients, the fact that you now have a special pen that you can moderate the dosage. And that came out much later because of the innovation that was required. And interestingly enough, Judge Hardiman, to FIAS versus Novolog, if you take a look at the declarations on JA101 and JA183, they go into more detail. But the pens that are used are different between the two products because they have to be manufactured differently. And so, Your Honor, going back to your question, Judge Friedman, however you think formulation means, we think it has to be interpreted in light of the surrounding language, but it's not so broad to cover different device presentations. No one would say that an injectable pen is just a different formulation of a vial or a syringe. We have the exact same drug and you can either administer a dose in a pen or with a syringe. You're saying those are not the same product. Those are not the same product and FDA would not treat them as the same product. But FDA is, I mean, I know FDA is evaluating a lot of things that CMS doesn't have to evaluate here. They're talking about product safety. They want to make sure patients get the appropriate amount. So there are lots of reasons for FDA to treat two things differently where CMS might not. Well, Your Honor, that's true in the abstract, but in the statute, it's very key that in subsection E, it refers specifically to the FDA approval regime. So the requirements are, it has to be on the market after FDA approval for seven or 11 years. It has to, and it can't be a listed product for another generic, either in the case of a drug or a biosimilar. That's really important because those are all done on a product by product basis. And so you're right, Your Honor, that CMS doesn't necessarily have all the considerations that FDA does, but Congress expected it to look at the decisions that FDA made. And then the only, it made a judgment that said there is some type of aggregation that you can do, but it's limited to the two provisions, the use of data provision and the pricing provision, Judge Friedman, that you highlighted. And the key there is they didn't say across ingredients or moieties. What they said is only dosage form and strength, including formulations. So if we get to the Texas statute and kind of Congress's intent, and we're talking about what intended, it strikes me that just at the very outset of F7, there was a congressional intent for legislative oversight, not judicial oversight. And there's waves of kind of jurisdiction stripping language in F7-2. And so as I see the waves in almost reverse order, it says the determination of a qualifying single source drug. You disagree with our determination. You've given us reasons for disagreeing with that. The next is the negotiation. So even if there was a problem with the determination, the negotiation process isn't, and then the kind of the selection isn't subject to judicial review. And so this strikes me as like a belt suspenders and another belt approach that Congress took to just say, we don't want courts to middle this. And you may be right that active moieties not involved, but is the answer judicial recess, redress when Congress kind of says three times no? Yeah, thank you, Judge Phipps. That gets to their second argument about judicial review. And let me walk through sort of three reasons why I think the court can, and in fact, Congress intended would get to this type of question. So first, just to level set this court along with many other courts have always said that when you approach with a judicial review bar, you interpret it as narrowly as plausibly possible. The first thing you look at is that the number of drugs in some section A, which is clearly Congress's decision of 10 and no more 10 drug products. That is not subject to any of the bars, Judge Phipps that you mentioned. So it's conspicuous that it's not. So if they selected 13, then that's judicial review. But strangely, if they would have grouped four of them together and said, it's not 13 anymore, it's nine or 10. Weirdly, that may not be subject to at least that bar. So your honor, let me let me say I respectfully disagree. But also, I have an answer to your second question. So the reason why I respectfully disagree is that I think that the law does not allow the agency to just sort of get around the number so easily. So I do think there's a reason to look, we have to read them in harmony. Correct. And if and if we, if we take a strong position that the secretary can make these selections and determinations by taking what would be 100, obviously disparate products, and pretend that they're one product and say, no, no look by the judiciary, that would be farcical. Exactly, exactly. Right. So does that mean that we should read this to say that, let's assume for a minute that your product, pretend it's one product, not six, was actually the 15th most costly. And the task here initially was to pick the 10 most costly. Yes. Do you concede at least that you don't have any grounds to say, look, they did the math wrong. You should not have included us in the top 10 because we're 15. Absolutely right, Judge Hartman. And I think Judge Phipps, if I could take that and answer your question, it's very notable that each of the review bars talk about the selection, and then they refer specifically to the determinations that are being made. If you take a look at the selection provision, what it tells the agency to do is to rank all the drugs and then figure out what the numbers are and reach a calculation. If you take a look at the definitional provisions, what they say is they start off with Congress defines the universe. It says, these are all of the drugs that are qualifying single source drugs. And then you agency can make a factual determination. It uses the word determination to exempt or exclude. And then what happens is when you get from the qualifying single source drug definition in E, you then go to D with the negotiation eligible drug, where again, Congress defines it, sets the definition and says, but you can narrow the category by accepting certain products and engaging in a calculation. So Judge Phipps, the way I would marry Judge Hartman, your question, Judge Phipps, with your question is that when Congress is talking about the determinations, what it was talking about were the specific factual calculations and rankings that it directed the agency to make. And those determinations, the narrowing of the definitions is almost like an exercise of enforcement authority. It's not subject to judicial review. So is the axis that you're, you're drawing kind of almost one of fact finding versus legal interpretation. If you sit there and say the agency's fact finding is off limits, we don't want courts getting into, you know, orphan drugs or anything else like this. But when it comes down to what interpretation you want to give to, you know, qualifying single source drug or otherwise, that's, that's still in play. As a practical matter, I think what the language refers to is the determinations. And then when you track that. Determination only refers to factual determinations. Thus, the only thing that's out of, that would be factual determination. So a challenge to a legal determination made by the agency or a grouping determination. At least the, the idea I think is that the definitions are not for the agency to change. And so the challenge that the agency has rewritten the definition is within the court's authority. For exactly Judge Hartman, the reason you say that we distinguish between, and this gets me to my third point that even if you don't agree with me, but I hope you do. Before you get to your third point, I just want to, on the determination issue, the background case, which the government addressed in the red brief, that's a presidential third circuit opinion where we address the word determination. And we said that a determination includes the process by which the decision maker reaches the decision. Absolutely. You're on. That's exactly right. But the process that they reach the decision starts within the framework that Congress has defined. My third point was just that you look at statutory mandates. And the point is, is that the agency doesn't get to rewrite the mandates. It has to operate within those mandates. So the determination of what to accept as a low spend drug or what to exempt because it's a small biotech drug, the process that the agency applies is not subject to judicial review, but it can't go ahead when Congress has said, this is the universe. It can't expand the universe by rewriting the definitions. I guess that gets back to the formulation issue. I mean, because I mean, twice in the statute, it refers to formulations and it gives an example of different formulations, you know, extended release formulations, but it anticipates that there are other examples, right? But Your Honor, all I would say is, I'll give you one more example. One is that the products here are not different formulations under any definition. They're different device presentations. They're different conditions of use. And we know in 2027 IPAE, they've even now applied it to use for different patients with different clinical trials. These are not just formulations. If it were, then the agency would have just said, we are applying the price and the data across different products. Instead, it came up with a whole new definition of active ingredient, which is sweeping in a whole bunch of things that Congress didn't permit. Assume we disagree with you on that. Give us your best argument for why we should use the BLA as the measuring stick. As I understand it, there's a separate BLA for the Novo, three products and the three FIAS products, right? There are separate BLAs for each? There are, correct. So, I mean, I understand what you were saying before. What I understood you'd be saying at least is that the government can't have it both ways. If the FDA is going to make the company jump through certain hoops for each different iteration of the product, then they should be treated separately. But as Judge Freeman pointed out, perhaps the FDA approval process is looking at a different thing than what the Secretary is looking at here. But address the issue of the separate BLAs for the two categories. And I don't know if I'm fully understanding you, but what I would say, Your Honor, is that there are definitely, FDA treated these as two separate families of products. Yeah, that's my point. I mean, they have different names. You're branding them differently. And if each has a different biologic license application, then should the conclusion just be sort of basic common sense that if you've got two separate BLAs, then you've got two different products rather than one product. I think that's right. I mean, Your Honor, I want to maintain the position because it's product specific that if you take a look that in the BLA, you have the vial in 2017, and then the pump cart, which is a new technological advance that comes through in 2023. Novolog, totally different family. You're right. That was approved in 2000. And then you have the FlexPen in 2019. And what we would say is that you are absolutely correct that those are two separate families and they shouldn't be mixed. But even within that, you can see the differences between the innovation that happened between 2000 and the special pen that was developed in 2019. And we would say that all of that means that CMS can't just combine them together. One thing that your narration just prompted in my head is there's a seven-year period. There's a seven-year window. They have to be on the market. And you just said that these drugs appear at different points in time. And so it feels a little strange at one level. If a new drug comes on, would it be included? And so it seems that at least a seven-year window would suggest that we want to see the NDA be the same period or something else be within that seven-year period. And it feels weird at one level. Maybe I'm just carrying through your thought, but it feels weird at one level to say, oh, hey, each one of these drugs came at different points in time. But as long as they're all within the separate window, then we can aggregate them into one drug. Correct, Your Honor. And we go into some detail in the briefs because there's so much of the statute that has to be rewritten. So in our view, the 10 products was really important. The 7 or 11 years before you were subject to the price is really important. All of that is getting wiped out by the agency. There's also other provisions like exclusivity provisions that don't come into play because they're less than seven years, but are now getting wiped out because suddenly products that would come onto the market more recently. Now, Congress, obviously, this is the product hopping point. Congress said that if all you're changing is the dosage form or strength or formulation by extended release, then maybe those types of changes would be aggregated. But when you're doing other innovations, we're only going to go far, but no further. Your Honors, I know I'm past my time. Would you like to hear anything about a quick word on the guidance or on the Constitution? We can address that on rebuttal. I will do that. Thank you very much. Thank you, Mr. Parrish. Ms. Powell? May it please the Court, Lindsay Powell for the government. There's a lot going on here, so I want to try to be very precise and specific. I want to start with the language of 1320 F1D3B, which gives us what's really at issue here in this how are we is the definition question. So, Congress there says, in determining, so this is one of the determinations that CMS is instructed to make in one of the provisions referred to in the judicial review bar section. In determining negotiation eligible drugs, CMS shall use data that is aggregated across dosage forms and strengths of the drug, including new formulations of the drug, such as an extended release formulation, and should not disaggregate based on the specific formulation or package size or package type. And so, if you look at NOVO's website, how it refers to these products, the FIAS products are a different formulation, in NOVO's words, of the NOVOLOG insulin aspartic products. These are two different formulations of the same active moiety, and formulation is how they're referred to on the website, it is how the agencies refer to that, think about it. That lines up with the fuller language of the statute, formulations such as an extended release formulation. FIASP is a faster acting formulation, it's not extended release, it's sort of the opposite of that, but this is exactly what Congress was talking about. It's basically the same drug? It's the same active ingredient that has, so for FIASP it has vitamin B3 added to make it exactly this question. Then why do they need separate biologic license agreements? Because as Judge Freeman's question... It's the same, they shouldn't have to get a separate license. No, your honor, because that's a different statute that's getting at a different thing, so the safety questions that FDA has to answer are entirely separate from what Congress was getting at here when it was figuring out how products should be considered for figuring out what Medicare will pay for them. And so, the statute is replete with references indicating that it's not a one-for-one with the application. So, if you look at 1320F-3E1D, it tells CMS in negotiating the price to consider applications, plural, and approvals, plural, or the drug singular. I'm sorry, you were 13... 1320F-3E1D. E as in Edward? E as in Edward, yep. CMS must consider applications and approvals for the drug. So, clearly within the context of this statute, it is not the case that drug or biological product means this one-for-one, that each application is a new drug within the sense that it is used here. I'll just stop you for one second. Mr. Paris said that there's a difference between formulations and device presentations. And I think we were discussing at that time how there are some of these six items that are perhaps exactly the same formulation, same dosage, same everything, except one is in a pen and one is in some other device. So, how does that fit into your reading of the statute? Yes, Your Honor, Congress spoke to that specifically to where it said not to disaggregate based on package size or package type. So, the difference between a refillable pen that you can use to inject versus a disposable pen, that's a difference in package type. So, again, Congress specifically addressed these questions, told CMS to aggregate for purposes of figuring out what is a negotiation-eligible drug. And the really key thing here is that everything we've been talking about is what is a  And Section 7.2 tells us that that determination made by CMS, the determination of what is a negotiation-eligible drug, is not subject to judicial review. That bar is quite clear in terms of its scope. But don't we have to read that in harmony with the part of the statute that says that there are going to be 10 drugs selected? You can't be arguing, can you, that if the Secretary made farcical decisions about what a negotiation-eligible drug was, that that's barred from judicial review? I know that's not what happened here. There was obviously a good-faith effort to try to identify the 10, and there's a good-faith But you could conjure a scenario where they just said, well, we've got 10 drugs here, and you look at the 10 drugs, and it's actually 50. And you're saying that's barred from judicial review? Then that would be an end-run around the requirement that the first year, there are only 10 drugs selected, wouldn't it? So, as long as the dispute is about the meaning of negotiation-eligible drug, which it unquestionably is here, then Congress has barred review of that determination. That is clear from the face of the statute. And actually, the frame that courts have brought, including this court in Bachran and Giambalco and other cases, in approaching these review bars, is that the end-run that the court's usually worried about goes the other way. Are you interpreting the review bar in a way that basically eviscerates it to allow them to go around it? I don't know. I'm having trouble with it because, I mean, take an analogy to the jurisdiction stripping provision of 1252 in the immigration context, which you may not be familiar with, but what it basically says is that the courts don't have jurisdiction to hear cases unless they involve questions of fact or law. Now, if the agency says, this is a question of, excuse me, we don't have jurisdiction unless it's a question of law or a constitutional question, right? So if the agency were to take a question of law and dress it up as a question of fact, we would take a look at that and say, well, you can call it a question of a fact, but it's not. So in other words, there has to be some sort of peak at the merits in order to figure out whether the jurisdiction stripping provision applies, doesn't there? I agree with that, Your Honor, but here the peak at the merits confirms that what we're arguing about is the meaning of negotiation eligible drug. And so to give meaning to the text of 1320 F7 to the prohibition on review of these questions, Congress was quite clear and broad as far as it goes in saying there shall be no administrative or judicial review of the following determinations. And that's everything in 1320 F1D, the meaning of negotiation eligible drug, in addition to the selection and the qualifying single source drug definitions. And so you do peak ahead to the merits. What is the dispute here about? And in their own words, it is emphatically about that determination in subsection D. And can I just pick up on this? You know, you pointed us at one point in time to the addition of the S on applications and approvals. But, you know, there is a difference in the addition of an S in the jurisdiction stripping provision because it says the determination of negotiation eligible drugs, plural, and the statute kind of begins to talk in the terms of singular negotiation eligible drug. And so I guess doesn't that lend itself to a meaning that, hey, look, when they use the plural, they're talking about what qualifies for purposes of the annual limit, whether it's 50 or selection gets us down to 10. But the phrase drug is singular. And so maybe when it comes to the construction of that statutory term, that's not what determination is. That didn't cross my mind beforehand, but you pointed out the value in the addition of the letter S. It seems that there's also a difference in these two constructions as well. I think the reference to the plural in F7 confirms the scope of that provision, that this is not just the picking of a particular drug, that it's not the sort of endpoint selection, that it is that whole process consistent with what the court said in Bachran and construing the similar language of the review bar there. A determination includes not just, again, the final endpoint, but the process leading up to it. And we see that. But I guess just to push back, I mean, we've got this canon that says any ambiguity we construe against judicial stripping, kind of a substantive canon of clear statement or something like that. But Congress could have been clearer, right? They could have said the meaning of the term negotiation eligible drug and the determination of negotiation eligible drugs for purposes of the annual limit. It could have been clearer. And instead of that clarity, you want to read the phrase that they've used as meaning those two phrases that I just articulated. Am I understanding that correctly? No, I think, again, the succinctness, the brevity of the way this is worded in F7 confirms its breadth. If these were actual questions, whether it also meant this, it also meant that, Congress would have been much more specific that it just said precluded broadly determinations under subsections, sorry, determinations of qualifying single source drug of negotiation eligible drug under the entire subsection E, subsection D confirms the breadth. And also it makes impossible, I think, the reading that plaintiffs are suggesting of. It's really just certain subsections, those particular fact finding determinations that that's what Congress meant. If Congress meant that, it would have said so. This is really quite broad and it's not novel. There are echoes of this and all sorts of other cases that we've cited in our brief where Congress has precluded judicial review of certain CMS determinations and the courts have case after case said, yes, where Congress precludes review of the estimate, it also precludes review of the underlying methodology of all sorts of things that are related to intertwined with that estimate, because otherwise there's just a big end run around that review bar. We know what Congress meant here. It meant to preclude review of certain things. And if plaintiffs could get around that every time by saying, wait, wait, but the thing we want you to- It clearly meant to preclude review of certain things. We're trying to figure out what those certain things are. But those certain things are broadly stated. So again, determination of negotiation eligible drug under subsection D, everything we've been talking about is the meaning of subsection D. So I don't know what Congress could have meant if it didn't mean- But F doesn't say the determination of negotiation eligible drug. It says drugs, selection of drugs, as Judge Phipps pointed out. It's single source drugs. That seems to bespeak that there's no judicial review of the choice of the 10. You can't challenge the 10. But that doesn't mean the court can't say, well, the secretary was entitled to pick 10, but the secretary wasn't entitled to pick 16 or 11. I don't think there's any fair reading of the actual text of the statute that supports the question about 10 is in subsection A, which is not referenced in F7. So I think the only sort of- Well, I know that's why they're arguing that we can review this under A. Right. But then everything that they want you to think about is under D, which is why it's not genuinely a question about how many drugs can the agency pick. The agency picked 10 drugs like it was told to. The question is, what do we mean by drug? Did the agency somehow get that wrong? What's the definition? Where are the definitions so we can know what a drug is, what a dosage is? Do we have definitions for those or- Don't, but we do. The clearest instruction we have is Congress saying, and it's directly addressing this question, how to aggregate. And it says that CMS shall use data that is aggregated across dosage forms and strengths of the drug. And it is telling that that's where they want you to stop. They just keep saying dosage form and strength, but that's not what Congress said. We've got dosage form, we've got strength, we've got new formulations, we've got package size, we've got package type, and it's a non-exhaustive list. So Congress was quite clear that the- What does new formulation mean? It's not defined in the statute, but it is how they refer to their FIAS drug as a different formulation, a new formulation that acts faster than the Novalog formulation. And it's new enough that the FDA says you need a new license for it. FDA requires a separate approval of all sorts of things for safety considerations that are not implicated here. This is a financial statute. This is about how do we think about taking into account the interest in developing new drugs and all these other things, what the government should be paying as a matter of responsibly managing the FISC. And those are just fundamentally different considerations. And so the text of the statute bears out that this is not a one for one, that trying to the idea that one drug application, product application there relates to one drug here. It's not, that's apples and oranges. The review bar also resolves their, excuse me, question about the guidance. And we know this from Yale New Haven Hospital, where you have an argument, the substance of which is barred by statute. Courts have not looked, allowed plaintiffs to get around that and to challenge, effectively challenge that substantive determination based on the underlying procedures. And that's what plaintiffs are trying to do here. And so that should fail for the same reason that also fails on the merits. Congress very clearly directed CMS to proceed by program instruction or other form of program guidance. And plaintiff doesn't actually argue that CMS was supposed to use notice and comment here. That's not the point. They say that somehow CMS was supposed to implement this entire program in the first three years without binding anybody. And it is unclear what that could possibly mean or look like. CMS did what Congress told it to. It implemented the program for the first year, which is what's at issue by program instruction or other form of program guidance. But then it changed a lot of the requirements of the program, right? I mean, the statute allows a manufacturer to unilaterally terminate its agreement within 11 to 23 months notice. That's what the statute says, correct? I'm sorry. Can you say that again? The statute says that a manufacturer can unilaterally terminate its agreements under these programs with 11 to 23 months notice. Okay. Right? Statute says that. But then the agency comes and says, just kidding. We'll give you a 30-day exit period. How do you square that? Well, so that's not at issue here, Your Honor. And I think in other iterations of these cases, we have explained why it is the agency's position that the good cause provision allows withdrawal from the program in these circumstances. But this is not any part of their challenge to how CMS implemented the program here. They just said there's some mismatch with the form that this took without really explaining what that even should have looked like. But doesn't that go to the larger issue of the variance between what the statutory requirements are and what the guidance documents say? There are a lot of disconnections between the statutory language and the guidance documents, aren't there? No, we certainly don't agree with that, Your Honor. And I have not fully briefed all the particulars of that here because it's not part of their challenge. But the main point is CMS said to proceed to implement it by program instruction or other form of program guidance. And that's what CMS did. And so that... Right, but doesn't the implement... I guess I didn't ask it properly. Doesn't the guidance have to be consistent with the statute rather than contrary to statute? Yes, and it is. But that question is separate from whether CMS used the right procedures, which is what they're challenging here. Very briefly on their... Can I get in on one thing? And just to hear from both sides, I asked Mr. Parrish about kind of do these jurisdictions stripping provisions layer? And I don't know if you followed that question. I don't know. But it struck me that maybe the first phase of the termination of a qualifying single source drug has a little give, play in the joints. Maybe that's not clear. Then if we get to the next stage, the termination of a negotiating eligible drug, it feels like whatever give there was on this one, well, hey, we can't review that at the next stage. And then at the final stage selection, whatever give there was in terms of how much courts can look at this first two stages, we certainly can't look at selection. And the bottom line here is selection. So I read these as... Maybe you can tell from the question, I read them as layering. Is that wrong? It goes to your advantage, I suppose. But if that does layer for a no vote to win, don't they need to kind of win on all three levels and say, look, even if there is a little give in the termination of no negotiation eligible drugs, maybe that would be reviewable. But hey, there's still no dice here because we can't review selection at the end of the day. What do you think about that layering? I agree, Your Honor. They do layer, absolutely. And it underscores taking in connection with the way those provisions are phrased and the breadth of determination, the breadth of drugs. It is Congress trying to cover the waterfront there. These are also, there's overlap between the way these subsections work together and the way that the cases have generally construed these review bars is to ask whether the question for which a plaintiff is seeking review is inextricably intertwined with the matter for which Congress has precluded review. And so these are all the different subsections all get at intertwined questions. And certainly the question of what is a negotiation eligible drug is deeply intertwined with all of this. And so I think you're absolutely right that the way these different clauses relate to each other does underscore the breadth of the bar. With respect to the constitutional challenges, I just want to address very briefly, plaintiffs are trying to stack unrelated constitutional challenges in a way that the case law simply doesn't support. We see very occasionally the sort of summation, the adding up of different constitutional issues in the context of the appointments clause and restrictions on removal. So we have that in CELA law and free enterprise. Those are compounding problems of the same type that add up to a sufficient restriction on removal that it gets to a constitutional problem. There's no case that says, well, you've said something about non-delegation. You've said something about due process on their own. Those are not a problem, but you put them together and somehow there is one. That's not a thing. That's not the math that the Constitution has ever been acknowledged to afford on the specifics of their non-delegation issue. It is, if you look at the brief beginning at page 52 and following, it's really just about how much leeway CMS had in negotiating the price. It's just about the price setting part of it that they're saying. And there is a lot of intelligible principle given to CMS in negotiating that price. At 1320F3E1, there are all sorts of factors CMS is directed that it must consider in figuring out what offer to make, what counteroffer to accept. So it's R&D costs. It's how much of those have been recouped. It's the cost of production and distribution. It's how much the federal government paid to support R&D. It's therapeutic alternatives. These are very specific things that CMS has been told to consider and did in its negotiation. So there's no intelligible principle problem. On due process, I know the court has had a chance to consider this in other cases as well, but the whole argument rises and falls on the lack of a protected property interest. Their reliance on public utility cases is telling. That's just a different market altogether, differently regulated industries. There is no protected property interest here, either in the drugs themselves, since they're not being made to give them over. That really goes to the takings argument. And there's no protected interest in being able to command the price you want from the government. They don't have a right to get the government to pay a certain amount. And so that argument falls. And very briefly, if I may, on the First Amendment question, this has been presented as the government making these companies be their mouthpiece and present this message with which they disagree. And that's done by signing an agreement. And I just want the court to note that these agreements are not public. So for all the government is being said to be turning these companies. It's not the signing of the agreement. It's the words maximum fair price. But it can't be just the words maximum fair price in the statute, because that's just Congress speaking, right? That's not no company is saying that as far as it goes in the statute. That's just what Congress is calling it. So in order for it to be the company speaking, they have to be being made to own that. And so I don't know that. I mean, that that breaks down a little bit with Woolley. I mean, if the New Hampshire legislature says our state motto is live free or die, you don't sit there and say, oh, that's just the legislature speaking. You say now I now I have to carry that on my license plate. Well, but that's the thing. It's the carrying it on the license plate. That's that is you having to own it and become what the court said there. And here it's the carrying the agreement. Your argument is, well, the agreement's private, right? Well, but anybody who can read says it can connect the dots that the statute says maximum fair price. The new price is one third of what or a lot less than it used to be. Therefore, they've admitted that they were gouging us for years. Those dots aren't hard to connect. They I think in the context of the First Amendment doctrine. So the Johnson Texas versus Johnson says that for for conduct to be sufficiently expressive, that it matters as a First Amendment concern, you have to ask whether there's an intent to convey a particularized message and whether the likelihood was great that the message would be understood. And so the idea that in this short private agreement that memorializes the program terms that the government is not publicizing, it's not published, it's only publicly available because plaintiffs put it in the appendix here that and in the context of that, you have not a disclaimer, but just interpretive tools saying do not read this agreement to understand the manufacturer to be expressing anything more than that this process has taken place. And there is now a price that governs that does not reach the Johnson standard. I just think I think we covered this last fall, but I think with you, I think right and someone else other than Mr. Parrish in the chair. But there's an easy fix to this. You strike it, you strike out the language maximum fair price in the agreement. And it's the government doesn't want to do that, I guess, because the statute leans into that language and the companies don't want to do it because the companies don't want like the prices in the agreement. So both sides don't like it. But that seems to be an easy fix. If you think there's a compelled speech problem here, that's a really easy fix. Sign an agreement. It's a new price. Everything stays the same. You make no representations about whether this is a fair price, an unfair price, etc. That may be true, but it would still be an unprecedented and not inconsequential thing for the courts to start fly specking. Congress's contracts are reformed all the time. Courts reformed contracts all the time. Not on First Amendment grounds. To piggyback on Judge Hartman's point, it wasn't the remedy in Woolley to strike, live, free or die from the license plate. The rest of the license plate was intact. The remedy wasn't no license plates in New Hampshire. The remedy was keep all the keep all the alphanumerical digits we've given you. Keep the state of New Hampshire. Keep the expiration date. Just strike, live, free or die. Why isn't the remedy here? Strike the reference to maximum fair price. The context of government contracting is different. And all the time, the idea of a fair and reasonable price is fundamental to government contracts. That is part of the federal acquisition regulation that is in there. And so if parties can come in and say, you made me say agree. You made me say fair. You made me say this. These all newly raised First Amendment concerns. The courts have never held that before. It has never been thought to be a First Amendment issue that the use of agree, of negotiate, of fair in a government contract raises a First Amendment concern. And so I get, does this feel a little different if it's maximum fair price maximum? I think it's just referring to it being the most that the government will pay. But it is not a small or standard thing for the courts to come in and say government can't use these terms in its contracts. That would be new.  Thank you, Ms. Powell. Parrish? Let me just make two points on the 10 drug limit, and then I'll quickly address the guidance on the other one. On the 10 drug limit, all I would say is that in order to avoid these nuances, all the court needs to ask is, did she say anything to defend active ingredient, active moiety? She didn't. She tried to tie it to the aggregation provisions of the statute, which talk about dosage, form, strength, and formulation, but those are not as broad. And then Judge Phipps, I would say on the layering, all I would do is urge you to actually look very closely at the determinations that Congress expected the agency to make. And what you will see is that the question of 10 drug products was dictated by Congress. The idea that the agency would come up with a new definition for more than 10 substances is not delegated to the agency. The determinations that it was supposed to make would exempt or exclude from the broader definitions. So the layering works, but only not in this context here, because they're not doing what Congress has authorized them to do. On the broader problem that we're trying to make about the agency's rewrite of the statute is the broader separation of powers concern. The government's position on guidance is truly extraordinary, because the Congress first said, you shall proceed, you shall implement by guidance. Guidance, we all know, means non-binding. The government says, well, we couldn't do that because then we couldn't do anything. That's not true. That misses the distinction between generally applicable rules and case-specific determinations. Obviously, there are things that the government can do. We list this in our brief. But what it cannot do is make new law. The government's position to you today is that if Congress says implement by guidance, what it is giving the agency, as it's interpreted, is unlimited, unreviewable, unchecked rule-making authority to do anything it wants that departs from the statute. What parts of the guidance are you objecting to? So, Your Honor, if you take a look at the brief, we obviously object to the fact that they're trying to redefine what we think are the statutory definitions. We are also objecting to the fact that on the... Redefine which statutory definition? The ones we're talking about, Your Honor, about aggregation. So they do that by guidance. They don't take notice and comment on that. They say all of these issues about what counts as dosage, form, and strength, we're just going to wrap that all up in this idea of active ingredient. And we would say that's the type of thing that you would usually have rule-making with judicial review. The other thing, Your Honor, is that when Congress said, here's the information you can get, the government has imposed significantly more onerous and burdensome requirements to disclose confidential information. They've put into the manufacturer agreement a requirement that not only we agree to the current rules, but any changes that they may make in the future in future guidance, which essentially means under their view of the world, at whim by issuing a press release, they can change the terms of the agreement. All of those types of things are supposed to go through notice and comment rule-making. There is no precedent she's ever cited or the government has ever cited that would allow agencies to have just open-ended rule-making authority, particularly without a clearer statement by Congress. When Congress says proceed by guidance, which is non-binding, interpretive rules, policy statements, to suggest that that means that they can exempt themselves from any procedures is really extraordinary. How do we know the guidance means non-binding? In this case, I understand why you're saying traditionally that would signal non-binding, but when you read the statute here, there was a pretty strong directive to the secretary to actually do things that would have dramatic economic effect on this industry, correct? Correct, Your Honor. So what I would say is two things is that we usually interpret statutes when Congress uses terms of art. Under the APA, and we cite these in our brief, the Perez case and the administrative council, everyone knows that guidance is distinct from rule-making. And Your Honor, you're absolutely right that they would have massive consequences, but there's a difference between general substantive requirements that apply to everybody versus one-on-ones. And so the agency can do things, but what Congress was saying is one, move slowly, two, 10 products, and three, you're not going to be able to fill in the statute with other requirements or go beyond the statute for three years. We want you to apply the statute strictly. And what that means is that there were some ability for them to negotiate with individual manufacturers, but they can't create, you can't force us to turn over this. You can't change the requirements that are in the agreement and make those binding on us. And Your Honor, what I'd say is that takes me to my third point, which is the problem of the whole statute. And I would urge you to, I'm going to make two points here that I hope will be helpful to the court because I think it might inform some of the thinking that you had in the fall argument. The government has yet to date, after all these briefings, has never identified any other statute ever that has no standards that apply as to what the price will be. If you ask your clerks or ask yourself, what is the price conceptually? Is it just and reasonable? Well, but the government can set whatever price it wants. That's the problem. I assume you concede as your predecessors and interests, so to speak, conceded. If Congress passed a law tomorrow saying we're spending tremendous amounts of money on these 10 drugs and the price schedule for these 10 drugs is as follows. That's a valid law, correct? That is, that is. So Your Honor, what I would say is two things is one is what's really key here is this is not government procurement. The government is- I understand. I understand that. So what it's doing, but Your Honor, your- But the government, the government, the government has the power, does it not? The Congress.  The Congress has the power to set prices on this just like it does with other things. And there's a much more reticulated pricing scheme, I think, in the VA and the DOD and those other systems. So those- And the only difference I can perceive, correct me if I'm wrong, is that in those instances, those reticulated schemes were established by Congress rather than through some broad delegation to the agency. So Your Honor, you are right that that is a difference. But the other big difference is that, and your court, the court's cases talk about this, that when a government is acting as a market participant, when it is purchasing products for itself, then you apply the question, is it coercive under NFIB? Is it voluntary or not? But if the government is exercising regulatory powers, so what it's doing here is it's regulating the price, not for the government to buy, but actually the price between us and the beneficiaries that then get insured by the Part D plans. And then the question is what the government subsidizes. In those contexts, if it's exercising regulatory powers, there's not much that the government has to do, but it has to set forth procedures to protect the due process rights of anyone who's subject to make sure that the prices ultimately that are imposed are reasonable and that the agency is acting reasonably. And if you look through this- But if we're going to talk due process, isn't the strongest argument from your perspective that the 30-day exit option is illusory because it's inconsistent with the statute? I totally agree with that, Your Honor. I also agree that the 1900% penalty means that the whole negotiation process is illusory. But what I'm talking about more specifically, Your Honor, is that if the government can do this here, it could do it with any goods. For example, your house. Everyone talks about housing prices are too high. The government could say, we are going to now say that if you want to sell your house to anybody between the ages of 20 and 55, you will go through a market that's indirectly regulated by the government. And you would say that the government could do that. But if it wants to regulate those prices, it has to have both a standard to make sure that the agency is doing what Congress has made the judgment, so it's accountable. And you also have to say that the agency has procedures so that your house isn't taken away from you at pennies on the dollar, but it's a reasonable process and a reasonable price. The problem here, Your Honor, the reason I started with accountability is that this statute is exquisitely designed to prevent accountability. Congress did not do what you said, which is to say we are setting price controls because that would have been unpopular and it would have taken responsibility for it. And now it's given it to an agency. But instead of having the agency go through the open public procedures that you would either through the APA or any other procedures on the statute, it says, no, it's just an agency's whim. And then what we have is we have the compelled speech at the end, which is to say that the manufacturers have to pretend like this is not forced, that it's not coerced, that it's not regulatory, but instead it's just a negotiation. And Your Honor, that the question I would ask the court and maybe ask the other side is, is there ever been a statute like this even during wartime? The answer is no, which is a very telling argument that they've gone too far. All right. Thank you very much, counsel, for both sides. We'll take the matter under advisement.